Robert Graves & Associates
89 Cambridge Street
Suite 201
Boston, MA 02129-1205
(617) 886-9100
Attorneys for Plaintiff James F. Hall

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| Plaintiff, | * |
| JAMES F. HALL | * |
| | * |
| v. | * |
| | * |
| Defendants, | * |
| JOHNSON & JOHNSON, a corporation, | * |
| DEPUY, INCORPORATED, a corporation, | * |
| And X CORPORATION A-Z, a corporation | * |
| (fictitiously named), And JOHN DOE 1-10 | * |
| (fictitiously named) | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMPLAINT AND JURY DEMAND**

Plaintiff, James F. Hall, by his undersigned attorneys, Robert Graves & Associates, hereby complains and alleges against the above named Defendants, and each of them, as follows:

**I.   INTRODUCTION**

1.   This is a product liability action wherein Plaintiff seeks recovery for his personal injuries and damages including, without limitation, associated medical expenses, pain and suffering and any other damages available at law, occasioned when a defective Johnson & Johnson Delta III Medial Offset shoulder prosthesis ("Delta III"), was implanted in his right shoulder, that was designed, manufactured, distributed, marketed, and/or sold by Defendants, and each of them.

**II.    THE PARTIES**

2.      Plaintiff, JAMES F. HALL, (hereinafter "Mr. Hall"), was and is at all times relevant to this case, a subject or citizen of Scotland, residing at The Quick Huik, Flat 3 Stanmore, 38 Barnton Avenue, Edinburgh, Scotland  EH4 6JL.

3.      Defendant, JOHNSON & JOHNSON, (hereinafter "J&J"), was and is at all times relevant to this case, a New Jersey corporation doing business in the Commonwealth of Massachusetts; and further, said Defendant held itself out as a company experienced and capable in the design, manufacture, fabrication and assembly of shoulder replacement systems, including the Delta III shoulder prosthesis, which were and are marketed and sold for implantation and use in Massachusetts, the United States,  Scotland, the United Kingdom, Europe and throughout the world.

4.      Defendant, DEPUY, INCORPORATED, (hereinafter "DePuy, Inc."), was and is at all times relevant to this case, a Delaware corporation, with its principal place of business in Raynham, Massachusetts; See http://www.depuy.com/corporate-information/about-depuy (quoting Defendants' web page, "Headquartered in Raynham, Massachusetts and Warsaw, Indiana, the DePuy Family of Companies is a $5 billion global presence that employs 5,300 people around the world.  As a part of the Johnson & Johnson Family of Companies, we are dedicated to the principles described in the Johnson & Johnson credo…" (last visited October 18, 2010); and DePuy, Inc. was and is doing business in the Commonwealth of Massachusetts; and further, said Defendant held itself out as a company experienced and capable in the design, manufacture, fabrication and assembly of shoulder replacement systems, including the Delta III

2

prosthesis, which were and are marketed and sold for implantation and use in Massachusetts, the United States, Scotland, the United Kingdom, Europe and throughout the world.

5. Defendants, X CORPORATION A-Z, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiff. When there true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages were proximately caused by those Defendants. Each reference in this Complaint to "Defendant", "Defendants" or a specifically named Defendant refers also to all Defendants similarly sued under fictitious names X CORPORATION A-Z.

6. Defendants, JOHN DOE 1-10, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiff. When there true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages were proximately caused by those Defendants. Each reference in this Complaint to "Defendant", "Defendants" or a specifically named Defendant refers also to all Defendants similarly sued under fictitious names JOHN DOE 1-10.

7. Plaintiff is informed and believes, and thereon alleges, that at all times material hereto and mentioned herein, each Defendant sued herein (*both named and X corporations and Doe Defendants*), was the agent, servant , employer, joint venturer, contractor, contractee, partner, division owner, subsidiary, division, alias, and/or alter ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude,

employment, contract, ownership, subsidiary, alia and/or alter ego and with the authority, consent, approval, control, influence and ratification of each remaining Defendants sued herein.

### III.   JURISDICTION AND VENUE

8. This Court has jurisdiction of the subject matter of the within action pursuant to 28 U.S.C. § 1332, as the action is between citizens of a State and citizens or subjects of a foreign state; and the amount in controversy exceeds $75,000, exclusive of interests and costs.

    a.   Plaintiff, JAMES F. HALL is a subject or citizen of Scotland in the United Kingdom.

    b.   Defendant, JOHNSON & JOHNSON, is a citizen New Jersey being duly incorporated under the laws of New Jersey.

    c.   Defendant, DEPUY, INCORPORATED, is a subsidiary of Defendant, JOHNSON & JOHNSON, and is incorporated under the laws of Delaware has as its principal place of business Raynham, Massachusetts.

9. Venue is proper in this District under 28 U.S.C. § 1391(a).

### IV.   ALLEGATIONS OF FACT COMMON TO ALL COUNTS

10. At all times mentioned herein, Defendants were engaged in the business of manufacturing, designing, assembling, compounding, testing, inspecting, packaging, labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising, recommending, advertising, promoting, marketing and selling the Delta III shoulder prosthesis, and its component parts and constituents, for resale and use by members of the general public.

11.     Further, the Defendants were engaged in the business of manufacturing, designing, assembling, compounding, testing, inspecting, packaging, labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising, recommending, advertising, promoting, marketing and selling the Delta III shoulder prosthesis, and its component parts and constituents, for resale and use by members of the general public.  The Delta III shoulder prosthesis at issue in this case was marketed and sold for consumer use to the general public upon appropriate approval.

12.     Defendant J&J and its officers, directors, employees, and/or agents, including but not limited to Mr. William C. Weldon (Chief Executive Officer), Mr. Dominic J. Caruso  (Vice President), etc, intended and planned that the Delta III shoulder prosthesis be marketed and sold for consumer use to the general public upon appropriate approval.

13.     Defendant, DePuy Inc. and its officers, directors, employees, and/or agents, including but not limited to Mr. David Floyd (President), Mr. Scott Ryan  (Vice President), etc., intended and planned that the Delta III shoulder prosthesis be marketed and sold for consumer use to the general public upon appropriate approval.

14.     On December 27, 2001, Mr. Hall fell from a ladder at his home in Edinburgh, Scotland.  He was taken to The Royal Infirmary Edinburgh (A&E) to be treated for his injuries.  It was found that Mr. Hall suffered injuries to his right shoulder.

15.     On or about January 13, 2002, Dr. Robinson at The Royal Infirmary of Edinburgh performed surgery on Mr. Hall to repair his right shoulder.

16. Mr. Hall's recovery was less than satisfactory and he consulted with various orthopedic surgeons. Mr. Hall was eventually referred to Dr. Jon Warner of Boston, Massachusetts.

17. On or about September 27, 2002, Mr. Hall came to Boston, Massachusetts to have Dr. Jon Warner operate on his shoulder. Dr. Warner operated on Mr. Hall's right shoulder.

18. Dr. Warner noted at the time of the surgery Mr. Hall had a "robust, healthy deltoid" muscle in his right arm.

19. Mr. Hall's post-operative progress was not satisfactory and he consulted with several doctors on what would be the best course of action.

20. Dr. Ian Kelly, a consultant orthopedic surgeon in Glasgow, introduced Mr. Hall to Dr. Christian Gerber (a shoulder specialist in Zurich, Switzerland), and noted that Mr. Hall had a "working deltoid" muscle in his right arm.

21. At this point, the pain in Mr. Hall's right shoulder was episodic and was always associated with use of his right arm. Mr. Hall experienced no significant pain while the right arm and shoulder was at rest.

22. On or about July 1, 2003, Dr. Kelly emailed Dr. Gerber and stated that Mr. Hall was a "good candidate for a Delta III shoulder arthroplasty which…should give him [Mr. Hall] a useful functional result with good pain relief." Dr. Kelly referred Mr. Hall to Dr. Gerber to implant the Delta III shoulder prosthesis in Mr. Hall's right shoulder.

23. Dr. Gerber saw Mr. Hall on August 4, 2003. After running tests and examining Mr. Hall, Dr. Gerber recommended that Mr. Hall have the J&J Delta III

shoulder prosthesis implanted in his right shoulder. Mr. Hall was exhibited a brochure of the Delta III shoulder prosthesis that was distributed by a DePuy, Ltd., a subsidiary of DePuy, Inc., and J&J.

24. Mr. Hall relied upon the express warranties made to him in the brochure by J&J, DePuy Inc., and the surgeons in selecting the Delta III as a treatment option for his right shoulder. Mr. Hall was told, and believed that the Delta III would provide him with a useful functional result of his right shoulder with good pain relief.

25. Mr. Hall also relied upon the J&J and DePuy, Inc. brand names in deciding to have the Delta III implanted in his right shoulder.

26. Defendants failed to warn Mr. Hall either directly or indirectly through their subsidiaries, agents or servants that the Delta III shoulder prosthesis could cause excessive pain.

27. The Delta III brochure Mr. Hall was given failed to warn of the possibility of excessive pain and suffering that could be caused by the Delta III shoulder prosthesis.

28. J&J and DePuy, Inc., both individually and by and through its subsidiaries, agents, servants and/or persons companies working on behalf of and for the benefit of J&J and DePuy, Inc., sold or caused to be sold to Mr. Hall one J&J Delta III shoulder prosthesis.

29. On or about August 19, 2003, Dr. Gerber implanted the J&J Delta III shoulder prosthesis in Mr. Hall's right shoulder. The surgery took place at Unilink Balgrist Hospital in Zurich Switzerland.

30. Mr. Hall followed his recommended post-operative treatment plan.

31. However, the pain and discomfort in Mr. Hall's right shoulder increased in both frequency and severity over the next five years (from 2003 – 2008). Contrary to what Mr. Hall was told, the Delta III did not provide him with a useful functional result with respect to his right shoulder, nor did the Delta III provide Mr. Hall with good pain relief. In fact, the pain in Mr. Hall's right shoulder was so bad that he could not use his right arm for even simple tasks, such as writing, opening doors or picking up light objects. Mr. Hall had to immobilize his right arm in a sling in order to alleviate the excessive pain in his right shoulder.

32. Initially, and throughout the time period from late-2003 through removal of the Delta III on October 22, 2008, Dr. Gerber, among others, thought Mr. Hall's excessive pain was quite possibly the result of a low-grade infection in his right shoulder. Tests were taken, however no infection was found.

33. In a February 19, 2007 email from Mr. Hall to Dr. Wigderowitz, Mr. Hall ranked his level of pain in the right shoulder a "10" on a scale of 1-10. He further described the pain as "extremely heavy – like a sprocket puller (or very fierce dog bite) and out of kilter, continuous night and day."

34. Mr. Hall continued to seek treatment to alleviate the severe pain and discomfort that the Delta III prosthesis was causing in his right shoulder, but nothing worked. After consulting with several doctors and orthopedic surgeons, (including Dr. Gerber), it was recommended to Mr. Hall that the best course of action would be to remove the Delta III prosthesis from his right shoulder.

35. On or about October 22, 2008, Dr. Carlos Wigderowitz removed the Delta III prosthesis from Mr. Hall's right shoulder. This procedure took place at the Ninewells Hospital in Dundee Scotland.

36. Dr. Wigderowitz noted that there was a badly bent screw in the Delta III shoulder prosthesis that was removed from Mr. Hall's right shoulder.

37. Dr. Wigderowitz also noted that the humeral component of the Delta III in Mr. Hall's right shoulder was loose before the operation to remove it.

38. Bone scans were taken that showed a loosening of the ball joint from the shoulder blade in Mr. Hall's right shoulder.

39. The deltoid muscle in Mr. Hall's right arm was strong and functioning before the Delta III was implanted into his right shoulder. However, as a direct and proximate result of the J&J Delta III shoulder prosthesis being implanted in Mr. Hall's right shoulder, Mr. Hall's right deltoid muscle had become "completely wasted" and Mr. Hall's right arm was of almost no use.

40. The pain and discomfort in Mr. Hall's right shoulder decreased markedly three to four months post-removal. It was at this point that Mr. Hall started to believe that the Delta III shoulder prosthesis that defendants implanted in his right shoulder was defective.

41. Unfortunately, the pain in Mr. Hall's right shoulder increased shortly thereafter. Mr. Hall traveled to Boston, Massachusetts again to have Dr. Warner operate on his right shoulder. Dr. Warner discovered three infections in Mr. Hall's right shoulder.

42. Dr. Warner treated the infection in Boston and the pain in Mr. Hall's right shoulder subsided from the infection, however Mr. Hall has had episodic pain in his right arm and shoulder due, according to Dr. Warner and Mr. Hall's physical therapist, to the weakened state of the deltoid muscle.

43. In July 2010, Mr. Hall again traveled to Boston, Massachusetts and Dr. Warner implanted a new shoulder prosthesis in Mr. Hall's right shoulder. Mr. Hall has followed his post-operative treatment plan.

44. Mr. Hall's pain has decreased dramatically and his pain medication has been reduced by approximately 90% since he had the Delta III removed from his right shoulder. Mr. Hall is exercising his right arm and shoulder as much as possible, however because the Delta III proximately caused his right deltoid muscle to be wasted, Mr. Hall still has very little use of his right arm and shoulder.

45. Mr. Hall underwent several unnecessary surgeries, incurred a large amount of out-of-pocket medical and associated travel expenses, and endured significant pain and suffering for five-plus years as a direct and proximate result of Defendants defective Delta III prosthesis being implanted in his right shoulder.

IV.   CAUSES OF ACTION

<u>COUNT I</u>
**Breach of Implied Warranties**
*(Against All Defendants)*

46. Plaintiff refers to, repeats and re-alleges each of the allegations in Paragraphs 1 through 45 of this Complaint and incorporates said allegations into this cause of action as though fully set forth herein.

47. At all times mentioned herein, Defendants J&J, DePuy Inc., and X Corporations A-Z and Does 1-10, were merchants who, with respect to the Delta III shoulder prosthesis, held themselves out to Mr. Hall and the general public as having specialized knowledge and/or skill regarding shoulder replacement systems in general and the Delta III shoulder prosthesis specifically.

48. Prior to the time that the Delta III shoulder prosthesis was sold by Defendants and implanted in Mr. Hall, the Defendants, and each of them, implied warranties to Mr. Hall and the general public that the Delta III shoulder prosthesis was of merchantable quality and safe and fit for the use for which it was intended.

49. Mr. Hall was and is unskilled and had no specialized knowledge in the research, design and manufacture of the aforementioned Delta III shoulder prosthesis and reasonably relied entirely upon the skill, judgment and implied warranty of the Defendants, in selecting and purchasing from the Defendants the aforementioned Delta III shoulder prosthesis.

50. Mr. Hall, as someone seeking treatment for his shoulder, was a foreseeable user of the Delta III shoulder prosthesis. Further, Mr. Hall's use of the Delta III shoulder prosthesis was foreseeable.

51. On or about August 19, 2003, Defendants sold to Mr. Hall one J&J Delta III shoulder prosthesis that was implanted in his right shoulder.

52. The Delta III that was sold to and implanted into Mr. Hall, was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would, and did in fact,

proximately cause severe injuries and pain and suffering to the Mr. Hall. After the Delta III was removed from Mr. Hall's right shoulder, it was noticed that one of the screws in the Delta III was severely bent. Further, Dr. Wigderowitz noted that the humeral component of the Delta III was loose before the operation to remove it. There were also bone scans that showed a loosening of the ball joint from the shoulder blade in Mr. Hall's right shoulder. Thus, Defendants breached the implied warranty of merchantability.

53. As a direct and proximate result of the defective condition of the Delta III prosthesis and the foregoing breach of implied warranties by Defendants, and each of them, Mr. Hall suffered injuries and damages as alleged herein above.

## COUNT II
### Breach of Express Warranties
*(Against All Defendants)*

54. Plaintiff refers to, repeats and re-alleges each of the allegations in Paragraphs 1 through 53 of this Complaint and incorporates said allegations into this cause of action as though fully set forth herein.

55. At all times mentioned herein, Defendants J&J, DePuy Inc., and X Corporations A-Z and Does 1-10, were merchants who, with respect to the Delta III shoulder prosthesis, held themselves out to Mr. Hall and the general public as having specialized knowledge and/or skill regarding shoulder replacement systems in general and the Delta III shoulder prosthesis specifically.

56. Prior to the time that the Delta III shoulder prosthesis was sold by Defendants and implanted in Mr. Hall, the Defendants, and each of them, expressly warranted to Mr. Hall and the general public, that the Delta III shoulder prosthesis was

safe, effective, fit and proper for its intended use. Further, Defendants expressly warranted that the Delta III would give Mr. Hall a useful functional result with good pain relief.

57.     Mr. Hall was and is unskilled and had no specialized knowledge in the research, design and manufacture of the aforementioned Delta III shoulder prosthesis and reasonably relied entirely upon the skill, judgment and express warranties of the Defendants, in selecting and purchasing from the Defendants the aforementioned Delta III shoulder prosthesis.

58.     Mr. Hall, as someone seeking treatment for his shoulder, was a foreseeable user of the Delta III shoulder prosthesis. Further, Mr. Hall's use of the Delta III shoulder prosthesis was foreseeable.

59.     On or about August 19, 2003, Defendants sold to Mr. Hall one J&J Delta III shoulder prosthesis that was implanted in his right shoulder.

60.     The Delta III shoulder prosthesis sold to and implanted into Mr. Hall, was neither safe for its intended use nor of merchantable quality, as expressly warranted by Defendants. After the Delta III was removed from Mr. Hall's right shoulder, it was noticed that one of the screws in the Delta III was severely bent. Further, Dr. Wigderowitz noted that the humeral component of the Delta III in Mr. Hall's right shoulder was loose before the operation to remove it. There were also bone scans that showed a loosening of the ball joint from the shoulder blade in Mr. Hall's right shoulder. Further, the Delta III shoulder prosthesis did not give Mr. Hall a useful functional result with his right shoulder nor did the Delta III provide good pain relief, as was expressly warranted by Defendants. Quite the opposite occurred, as the Delta III gave Mr. Hall no

functionality with his right arm and severely increased the pain in Mr. Hall's right shoulder significantly. Thus, Defendants breached the express warranties they made to Mr. Hall.

61. As a direct and proximate result of the defective condition of the Delta III prosthesis and the foregoing breach of express warranties by Defendants, and each of them, Plaintiff suffered injuries and damages as alleged herein above.

## COUNT III
### Negligent Product Liability
*(Against All Defendants)*

62. Plaintiff refers to, repeats and re-alleges each of the allegations in Paragraphs 1 through 61 of this Complaint and incorporates said allegations into this cause of action as though fully set forth herein.

63. At all times mentioned herein, Defendants J&J, DePuy Inc., and X Corporations A-Z and Does 1-10, inclusive and each of them, were engaged in the business of manufacturing, designing, assembling, compounding, testing, inspecting, packaging, labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising, recommending, advertising, promoting, marketing distributing and selling the Delta III prosthesis and its component parts and constituents, for resale to and use by the general public.

64. At all times mentioned herein, the Defendants, and each of them, owed to Mr. Hall a duty of care as the Defendants were engaged in the business of manufacturing, designing, assembling, compounding, testing, inspecting, packaging, labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising,

recommending, advertising, promoting, marketing distributing and selling the Delta III prosthesis and its component parts and constituents, for resale to and use by the general public.

65. At all times mentioned herein, the Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should have known, that the Delta III shoulder prosthesis was not properly manufactured, designed, assembled, compounded, tested, inspected, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandized, recommended, advertised, promoted, marketed, distributed and sold, for the use and purpose for which it was intended, it was likely to injure the person or persons by whom it was used.

66. The Defendants, and each of them, so negligently and carelessly manufactured, designed, assembled, compounded, tested or failed to test, inspected or failed to inspect, fabricated, constructed, analyzed, distributed, serviced, merchandized, recommended, advertised, promoted, marketed and sold the Delta III prosthesis and its component parts such that it was in a dangerous and defective condition, and unsafe for the use and purpose for which it was intended when used as recommended by Defendants. Thus, Defendants breached the duty of care they owed Mr. Hall.

67. The defective and dangerous character and condition of the Delta III shoulder prosthesis, and the fact that it was unsafe for the use and purpose for which it was intended when recommended by Defendants, was known to Defendants, or in the exercise of ordinary and reasonable care should have been known and discovered by Defendants. The dangerous and defective character and condition of the Delta III prosthesis was not made known to Mr. Hall by Defendants. Further, the Delta III

brochure Mr. Hall was given failed to warn of the possibility of excessive pain and suffering that could be caused by the Delta III shoulder prosthesis. Defendants also failed to warn Mr. Hall either directly or indirectly through their subsidiaries, agents or servants that the Delta III shoulder prosthesis could cause excessive pain. Thus, Defendants breached the duty of care they owed Mr. Hall.

68. On or about August 19, 2003, Defendants implanted or caused to be implanted the Delta III shoulder prosthesis into Plaintiff's right shoulder, for the use and purpose for which it was intended as recommended by Defendants. As a proximate result of the negligence and carelessness of Defendants, and each of them, the Delta III shoulder prosthesis malfunctioned and/or caused injuries to Mr. Hall. After the Delta III was removed from Mr. Hall's right shoulder, it was noticed that one of the screws in the Delta III was severely bent. Further, Dr. Wigderowitz noted that the humeral component of the Delta III in Mr. Hall's right shoulder was loose before the operation to remove it. There were also bone scans that showed a loosening of the ball joint from the shoulder blade in Mr. Hall's right shoulder. Thus, Defendants breached the duty of care they owed Mr. Hall.

69. As a direct and proximate result of the negligence and carelessness of the Defendants, and each of them, Mr. Hall was injured. Mr. Hall underwent the pain and injury of several surgeries as a direct and proximate result of Defendants' negligence. Plaintiff also endured an immense amount of pain and suffering as a direct and proximate result of Defendants' negligence. Mr. Hall has been injured, damaged, suffered and continues to suffer great physical pain, suffering and damage, as well as mental anguish,

as a direct and proximate result of Defendants' negligence, and has been generally damaged in a sum in excess of the jurisdictional limits of this Court.

## COUNT IV
### Violation of Massachusetts Consumer Protection Act -- G.L. c. 93A, § § 2 and 9
*(Against All Defendants)*

70. Plaintiff refers to, repeats and re-alleges each of the allegations in Paragraphs 1 through 69 of this Complaint and incorporates said allegations into this cause of action as though fully set forth herein.

71. The Defendants manufactured, designed, assembled, compounded, tested, inspected, packaged, labeled, fabricated, constructed, analyzed, distributed, serviced, merchandised, recommended, advertised, promoted, marketed distributed and sold the Delta III prosthesis that was implanted in Mr. Hall's right shoulder. However, the Delta III prosthesis failed to operate and function as designed and was defective, and these failures constitute, among other things, a breach of implied and express warranties under Massachusetts law. By manufacturing, designing, assembling, compounding, testing, inspecting, packaging, labeling, fabricating, constructing, analyzing, distributing, servicing, merchandising, recommending, advertising, promoting, marketing distributing and selling the defective Delta III prosthesis, Defendants, and each of them, have engaged in unfair and/or deceptive acts prohibited under section 2 of the Massachusetts Consumer Protection Act, Chapter 93A (the "Act"), and the regulations promulgated there under.

72. Prior to the time that the Delta III shoulder prosthesis was sold to and used by Mr. Hall, the Defendants, and each of them, implied warranties to Mr. Hall and the

general public that the Delta III shoulder prosthesis was of merchantable quality and safe and fit for the use for which it was intended.

73. The Delta III shoulder prosthesis sold to and implanted in Mr. Hall was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would, and did in fact, proximately cause severe injuries and pain and suffering to Mr. Hall. After the Delta III was removed from Mr. Hall's right shoulder, it was noticed that one of the screws in the Delta III was severely bent. Further, Dr. Wigderowitz noted that the humeral component of the Delta III in Mr. Hall's right shoulder was loose before the operation to remove it. Thus, Defendants breached the implied warranty of merchantability.

74. The Delta III shoulder prosthesis sold to and implanted in Mr. Hall, was neither safe for its intended use nor of merchantable quality, as expressly warranted by Defendants. After the Delta III was removed from Mr. Hall's right shoulder, it was noticed that one of the screws in the Delta III was severely bent. Further, Dr. Wigderowitz noted that the humeral component of the Delta III was loose before the operation to remove it. Further, the Delta III shoulder prosthesis did not give Mr. Hall a useful functional result with his right shoulder nor did the Delta III provide good pain relief, as was expressly warranted by Defendants. Thus, Defendants breached the express warranties they made to Mr. Hall.

75. As a direct and proximate result of the defective condition of the Delta III prosthesis and the foregoing breach of implied and express warranties by Defendants, and each of them, Mr. Hall suffered injuries and damages as alleged herein above.

76. Pursuant to G.L. c.93A, § 2(C) and 940 C.M.R., "[I}t shall be unfair and deceptive to fail to perform or fulfill any promises or obligations arising under warranty." The implied warranty of merchantability is specifically included in the definition of warranty in 940 C.M.R. § 301.

77. Mr. Hall, by and through his attorneys, has served upon Defendants a 93A Demand Letter concurrently with the filing of this Complaint.

78. Mr. Hall seeks to recover all damages allowable under G.L. c. 93A, including but not limited to attorney fees and treble damages.

WHEREFORE, Plaintiff, James F. Hall prays for judgment against Defendants and each of them as follows:

1. For general damages in an amount according to proof at trial and beyond the jurisdictional minimum of this Court;

2. For medical and related expenses according to proof at trial;

3. For economic losses in an amount according to proof at trial;

4. For costs of the suit herein;

5. For attorney fees of the suit herein;

6. For applicable statutory interest as provided by law;

7. For punitive and exemplary damages according to proof and such as the law allows;

8. For such other and further relief as the Court may deem just and proper.

## V. JURY DEMAND

79. Plaintiff demands trial by jury on all issues so triable.

DATE: October 19, 2010

                                      Respectfully submitted,
                                      JAMES F. HALL
                                      By His Attorneys

                                      Robert Graves & Associates,

By:    /s/ Robert Graves
        Robert Graves, Esquire
        BBO# 207760
        Robert Graves & Associates
        89 Cambridge Street
        Suite 201
        Boston, MA 02129
        (617) 886-9100
        RGraves@RGraveslaw.com